Filed 10/17/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>QUANG VAN QUAN,<br><br>    Defendant and Appellant. | G061191<br><br>(Super. Ct. No. 06CF2227)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Reversed and remanded.

Mary K. McComb, State Public Defender, and Cristina Najarro, Deputy State Public Defender, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

\*            \*            \*

In October 2010, a jury convicted Quang Van Quan of three counts of first degree murder and found true two felony murder special circumstance allegations that the

murders took place during the commission of a burglary, robbery, or attempted robbery. (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(17)(A) [robbery], (a)(17)(G) [burglary].) Following the enactment of Senate Bill No. 1437 (2017-2018 Reg. Sess.; Senate Bill 1437), Quan filed a petition in which he requested resentencing pursuant to section 1170.95 (now section 1172.6) based on changes made by the Legislature to limit accomplice liability under the felony murder rule and the natural and probable consequences doctrine. The trial court held an evidentiary hearing on Quan's petition (§ 1172.6, subd. (d)(3)) and found Quan was ineligible for resentencing. He now appeals.

In his briefing, Quan raises numerous claims of error by the trial court: he challenges the court's findings at the evidentiary hearing to support his conviction of first degree murder under a valid theory of felony murder; he contends the trial court could not reasonably find he was a major participant in the commission of the underlying offenses, nor could it find he acted with reckless disregard for human life in committing those offenses; and he challenges the trial court's denial of his resentencing petition to the extent it rested on a finding he was guilty of murder based on "the existence of implied malice" and aider-abettor liability. Quan also argues the trial court failed to consider and articulate the relevant factors for its major participant and reckless indifference findings consistent with governing case law; failed to conduct an independent review of the evidence as the trier of fact at the hearing; and failed to apply the beyond a reasonable doubt standard of proof.

But we address none of these issues because Quan is correct that his constitutional and statutory rights to be personally present at the hearing were violated, and we agree the error was not harmless beyond a reasonable doubt. We therefore

---

[1]     All further statutory references are to the Penal Code unless noted.

2

reverse the trial court's order denying his resentencing petition and remand for a new evidentiary hearing consistent with the principles stated herein.

## FACTUAL AND PROCEDURAL BACKGROUND

We provide only a limited summary of the facts because, in light of our decision to reverse the trial court's denial of Quan's petition and remand the case for a new evidentiary hearing, the trial court will be required to "review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "On May 29, 2006, Garden Grove police officers found the bodies of Phong Le, his wife Trisha Lam, and Lam's six-year-old son Tommy in separate upstairs bedrooms of the family's Garden Grove home." (*People v. Quan* (June 21, 2012, G044609) [nonpub. opn.].)

"The victims suffered numerous shallow and deep stab wounds to the head, neck, and back, which [the coroner testified at trial] would have caused extreme pain and suffering. The assailant or assailants bound the victims' hands with wire, and stuffed a baby's bib in Lam's mouth. . . . Lam had clenched her fist tight enough to drive her fingernails into her palm. The officers found the couple's infant daughter[, who was] Quan's goddaughter, in the master bedroom dehydrated and soiled in urine and feces but otherwise unharmed. The front door was unlocked and there was no sign of forced entry.

"Le, a former member of the Oriental Boys gang, had recently told a friend . . . he felt anxious because he owed people money, and they were after his family and him. Security cameras and monitors were placed throughout Le's residence, and he had recently changed the locks. Le carried a gun in his waistband, which he sometimes kept under a mattress.

3

"Quan, a [former] associate of a different gang, and Le met each other in prison in the 1990s. In May 2006, Quan lived in Houston, Texas. On May 17 or May 19, 2006, he visited probation and immigration authorities in Los Angeles.

"Cellular tower records [indicated a large number of telephone calls between Le and Quan on May 26, and also showed his presence at Le's home on May 26, 2006, the night of the murders. The records] showed that on May 26 at 7:50 p.m., Quan's cell phone received a call from a cell phone belonging to Quan's wife, [MH], from the vicinity of Rosemead, California. . . . At 10:55 p.m., Quan, using [MH's] cell phone near Le's home, left a voicemail message on Le's cell phone in Vietnamese: 'Phong, call me back, okay. The kid has a problem. We need to have a place tonight. All right. A mi. Call me back tonight.' . . .

"Alerted by [Lam's] coworker [when she did not show up for work the following Monday], Garden Grove police officers made a welfare check at [the Le] home on May 29th and discovered the bodies. The Le's master bedroom had been ransacked. The safe was open and two of the victims' cell phones, and a laptop computer, were missing. Cabinet doors in the upstairs bathrooms were open. Investigators found a gun under the mattress in the southeast bedroom, where Le's body was found. [A]n IOU from Le to Quan [was located] on a desk. [The officers] also found baggies, drug pipes, and a drug scale in the southeast bedroom, and a pair of latex gloves, one inside the other with a rubber band around the wrist area behind a door. DNA on the exterior of the gloves came from Le, Lam, and Tommy, and the DNA on the interior of the gloves belonged to an unknown person. In the kitchen, investigators found $66,000 in gold Krugerrand coins hidden in a cabinet. Le had methamphetamine in his system at the time of his death.

"In early June 2006, Garden Grove police officers travelled to Houston. They found Quan conducting a garage sale at his residence. . . .

"Officers arrested Quan on July 12, 2006.  They interviewed him on several occasions after he waived his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rights.  In a July 12 interview, Quan claimed he had last seen Le in Garden Grove in March.  He considered Le family, and Le was godfather to Quan's son.  Quan said Le owed a man named Tam money, and Tam had people 'sweating' Le for repayment.  Le also owed money to the owner of a local business called Magic Mattress, and a Black Dragon gang member nicknamed 'Saigon' was demanding repayment of $40,000 or $80,000.  Quan sold his van and borrowed money from friends to loan Le about $80,000.  In May, he came to California to check in with immigration officials.  He stayed a few days to a week before returning to Texas.

"Later in the interview, Quan acknowledged Le gave him an IOU.  To make the loan, Quan claimed he had borrowed the money from an organized crime boss named Peter Geo Wang (Peter).  Quan described Peter as dangerous.  The gangsters warned Quan and Le to repay the money quickly and threatened to kill them and their famil[ies if they did not comply].

"After the officers confronted Quan with the cell phone records, Quan explained he took Peter, 'Fat Boy,' and another man to Le's house, but Le was not home.  Quan phoned Le to tell him the men wanted to speak with him.  Le arrived home a short time later.  Quan initially stated he waited outside while the men spoke with Le in the driveway before accompanying Le inside.  While he waited outside, [Quan] phoned his wife, [and] then departed. . . .

"During a July 14 interview, . . . Quan asserted it was Peter and his cohorts who called Quan on a prepaid cell phone.  Quan merely took them to Le's house to discuss Le's $80,000 debt to Peter. . . .  Quan then drove to Le's house and the others followed in another vehicle. . . .  Quan claimed he stayed outside.  After a while, Le emerged from his house and told Quan the men wanted to know where the money was located.  Le then asked Quan to leave.

5

". . . [W]hen pressed by the detectives, [Quan] admitted he entered the house after Le came outside. Le angered the men when, pressed about repayment, he exclaimed, 'Fuck it. When I have it, then I will pay it.' Peter and Le directed Quan to leave the house. Quan denied knowing the men intended to kill Le.

"During a second interview later in the day on July 14, . . . Quan [said he] asked the men 'what [are] you guys doing?' Peter responded, 'none of your fucking business,' and told Quan to '[g]et the fuck out of here, it's none of your concern now.' Quan departed. . . . Quan insisted Peter told him they only wanted to talk to Le about repayment and he had no idea the men intended to rob, burglarize, or murder Le and his family. (*People v. Quan, supra,* G044609.)

The jury convicted defendant Quan of three first degree murders and found true two special circumstance enhancements. The trial court sentenced Quan to three consecutive life terms without the possibility of parole. A panel of this court upheld Quan's conviction on his direct appeal in which he challenged the prosecutor's use of peremptory strikes, an evidentiary ruling, and jury instructions. (*People v. Quan, supra,* G044609.)

In March 2019, Quan filed a petition for resentencing complying with the procedure set forth in Senate Bill 1437. The trial court summarily denied the petition on grounds that Senate Bill 1437 was unconstitutional as a purported amendment to Propositions 7 and 115—a rationale this court rejected during the pendency of Quan's appeal of that ruling. (*People v. Cruz* (2020) 46 Cal.App.5th 740, 755; *People v. Solis* (2020) 46 Cal.App.5th 762, 770.) A panel of this court therefore reversed and remanded the matter with directions for "the court to consider the merits of Quan's petition." (*People v. Quan* (May 24, 2021, G058451) [nonpub. opn.].)

On remand, the trial court issued an order to show cause (OSC) on Quan's resentencing petition and the Orange County Public Defender, as appointed counsel for Quan, filed a brief in support of his petition. In his brief Quan argued that under the

standards articulated in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), he was not a major participant in the murders, nor did he act with reckless disregard for human life in the commission of the felonies during which the victims were killed. Quan argued he therefore could not be convicted of murder under current law based on the requirements for felony murder specified in Senate Bill 1437. (See §189, subd. (e)(3).)

The prosecutor filed a responsive brief which advanced two theories for convicting Quan of murder. The prosecutor contended the evidence "presented at trial proves beyond a reasonable doubt Quan is guilty of first degree murder within the felony-murder special circumstances statute," consistent with *Banks* and *Clark*.

The prosecutor also asserted Quan was guilty of implied malice murder by aiding and abetting the slayings: "Petitioner is also ineligible for relief because the evidence shows beyond a reasonable doubt he aided and abetted the killer(s) and acted with malice aforethought." (Capitalization adjusted.)

Quan was not present at the evidentiary hearing conducted by the trial court on his petition. At the outset of the hearing, defense counsel made her appearance "on behalf of Mr. Quan," before adding, "He's in state prison. He is not present. And I do have authority to appear on his behalf pursuant to [section] 977(b)."

At the hearing, neither party presented new evidence (see § 1172.6, subd. (d)(3)); both relied on the original trial record. The prosecutor stated, "I'm not going to rehash all the elements of the *Banks-Clark* factors. I address them in my brief, and I would just submit to the Court that there is sufficient evidence beyond a reasonable doubt and the jury got it right."

Defense counsel countered, "Was this a heinous crime? Of course it was. Yes, absolutely. [But] it's not all these assumptions that can be made. There needs to be evidence, and the evidence falls far short, nowhere close to proof beyond a reasonable

7

doubt with respect to either factor, let alone both; those being the major participant as well as the reckless indifference."

The trial court reviewed and analyzed the evidence in its written decision. The court then denied Quan's resentencing petition. He now appeals.

## DISCUSSION

1.    *Senate Bill 1437 Background and Applicable Law of Murder*

The Legislature enacted Senate Bill 1437 """"to more equitably sentence offenders in accordance with their involvement in homicides."""" (*People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*).) The enactment narrowed the scope of the felony murder rule and provided in former section 1170.95, now section 1172.6, a path for resentencing for defendants previously convicted of felony murder who could not now be convicted under the new law. "Resentencing is available under the new law if the defendant neither killed nor intended to kill and was not 'a major participant in the underlying felony [who] acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2.'" (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*).)

If, as here, the parties do not stipulate that the petitioner is eligible for resentencing and there has been no "prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony" (§ 1172.6, subd. (d)(2)), the trial court is required to hold an evidentiary hearing to resolve the reckless indifference to human life and major participant questions. (See *Strong*, at p. 709.) The court's role at the hearing "is to act as an independent fact finder and determine [these issues] in the first instance." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123 (*Guiffreda*).)

The prosecution bears the burden at the evidentiary hearing "of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill 1437." (*Strong*, *supra*, 13 Cal.5th at p. 709.)

8

When "Senate Bill 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*." (*Strong*, at p. 710.)  Consequently, if the trial court as the trier of fact at the hearing "determine[s] beyond a reasonable doubt that a defendant was a major participant who acted with reckless indifference to human life, as those phrases are now understood [in light of *Banks* and *Clark*] and as the Legislature intended them to be understood when incorporating them into Penal Code section 189, then that defendant necessarily could still be convicted of murder under section 189 as amended" by Senate Bill 1437.  (*Strong*, at p. 710.)

In other words, such findings under *Banks* and *Clark* "establish a defendant's ineligibility for resentencing under Senate Bill 1437." (*Strong*, *supra*, 13 Cal.5th at p. 710.)  Conversely, if the prosecution at the evidentiary hearing "fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."  (§ 1172.6, subd. (d)(3); *Strong*, at p. 709.)

2.    *Defendant's Absence at the Hearing*

Relying on *People v. Basler* (2022) 80 Cal.App.5th 46 (*Basler*), Quan argues he was entitled to be present at the evidentiary hearing because it was a critical stage in the proceedings against him.  We agree.

a.    *Background Principles*

"'A defendant has the constitutional right to be personally present in court "where necessary to protect the defendant's opportunity for effective cross-examination, or to allow him to participate at a critical stage and enhance the fairness of the proceeding."'  [Citations.]  The right is guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution, as well as article 1, section 15 of the California Constitution.  [Citation.]  The state constitutional right to be present is generally coextensive with the federal due process right."  (*Basler*, *supra*, 80 Cal.App.5th at p. 57.)

9

"[A] defendant's right to be present depends on two conditions: (1) the proceeding is critical to the outcome of the case, and (2) the defendant's presence would contribute to the fairness of the proceeding." (*People v. Perry* (2006) 38 Cal.4th 302, 312; accord, *Kentucky v. Stincer* (1987) 482 U.S. 730, 745.)

Sentencing and resentencing hearings are critical stages in a criminal proceeding. (*People v. Doolin* (2009) 45 Cal.4th 390, 453; *People v. Simms* (2018) 23 Cal.App.5th 987, 996 [Prop. 47 wobbler reclassification].) Courts have consistently held that a defendant has a right to be present at proceedings that are "akin to a plenary sentencing hearing." (*People v. Rouse* (2016) 245 Cal.App.4th 292, 299.) This includes proceedings necessary to determine factual questions bearing on the defendant's eligibility for resentencing.

The defendant's presence is required when the court must make fact-bound determinations as it exercises its sentencing discretion, such as considering youth-related mitigating factors (*People v. Guerrero* (2022) 76 Cal.App.5th 329, 336), or after a change in law regarding an enhancement the court initially imposed (*People v. Cutting* (2019) 42 Cal.App.5th 344, 347-348 [resentencing on remand after successful appeal]).

*Basler* held that a section 1172.6 evidentiary hearing is a critical stage requiring either the defendant's presence or a valid waiver of his presence. Critical factors in the court's analysis were the statutory provisions which authorize the parties "to 'offer new or additional evidence'" at the hearing (*Basler, supra,* 80 Cal.App.5th at p. 58), the burden of proof on the prosecutor to prove beyond a reasonable doubt that the petitioner is guilty of murder under current law, and the trial court's role as the trier of fact on the question of guilt—whether or not new evidence is presented (*id.* at pp. 58-59; see § 1172.6, subd. (d)(3)).

The purpose of the section 1172.6 "resentencing hearing [i]s for the court to consider whether to vacate [the defendant's] conviction and recall [his or her] sentence, including by reviewing the record and taking new evidence, if offered, on the issue of

10

[his or her] actions and mens rea on the night in question. The question may well turn on disputed issues of fact 'about which [the defendant]—as a participant in the events in question—may well have had something to say.'" (*Basler*, *supra*, 80 Cal.App.5th at p. 59, quoting *Simms*, *supra*, 23 Cal.App.5th at p. 998.)

Respondent acknowledges *Basler* but suggests it was "wrongly decided" because there is no "guarantee" at a section 1172.6 hearing that the petitioner's sentence will be vacated. The Attorney General argues the hearing amounts to a "sentence modification process" that offers a possibility of, at most, "'only a limited adjustment'" because, by the terms of the statute, any new sentence may not be greater than the total original sentence. (§ 1172.6, subd. (d)(1).)

*Simms* rejected similar contentions (*Simms*, *supra*, 23 Cal.App.5th at p. 996), and *Basler* noted the decision at stake is whether to "'resentence the petitioner on any remaining counts *in the same manner as if the petitioner had not previously been sentenced*" (*Basler*, *supra*, 80 Cal.App.5th at p. 58, quoting § 1172.6, subd. (d)(1)). *Basler* therefore found the statute's authorization of a full evidentiary hearing "'akin to a plenary sentencing hearing' and thus a 'critical stage' in the criminal process even though it prevents imposition of a sentence greater than that originally imposed." (*Basler*, at p. 58.) Again, we agree.

We find puzzling respondent's characterization of the hearing as a "collateral sentence reduction mechanism" in which "all that is at stake is the possibility that [a defendant's] punishment may be reduced." It is true that the process created by Senate Bill 1437 was an "act of lenity" by the Legislature under which the defendant is not charged anew with murder, and thus the Sixth Amendment right to a jury trial is not triggered. (*People v James* (2021) 63 Cal.App.5th 604, 610; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156-1157.)

But the defendant's right to be present at this critical hearing is based not just on the Sixth Amendment right to counsel; the defendant's presence significantly

11

contributes to the fairness of the hearing as a matter of due process.  And the stakes could not be higher:  "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated . . . ."  (§ 1172.6, subd. (d)(3); see *Basler, supra*, 80 Cal.App.5th at p. 55.)  Thus, as Quan points out, the hearing "is not only akin to a plenary resentencing, but verges on [a] new trial" as to the theory or theories of murder newly at-issue under current law.  From Quan's perspective, the hearing could hardly be more critical.

*Basler* noted its holding was consistent with *People v. Lewis* (2021) 11 Cal.5th 952, 973, in which the Supreme Court found that due process requires the appointment of counsel once it has been determined that an 1172.6 petitioner has stated a nonfrivolous claim.  (*Basler*, *supra*, 80 Cal.App.5th at pp. 58-59.)  Had Quan been present for his evidentiary hearing, he could have "given input to his counsel on the People's presentation and arguments, resulting in his counsel drawing different inferences from the trial evidence or doing more than submitting on the papers."  (*Id.* at p. 60.)

*Basler* held a defendant has "a constitutional right to be present at his section [1172.6] evidentiary hearing . . . ."  (*Basler*, *supra*, 80 Cal.App.5th at p. 51.)  This right includes the opportunity "to hear the People's evidence and argument on the point, then decide whether to testify and/or present additional or new mitigating evidence on his behalf."  (*Id.* at p. 60.)  Quan was denied that right.

b.  *Waiver*

That leads us to the question of waiver.  It is well-established that a defendant may waive his or her right to be present at a critical stage, "provided the waiver is knowing, intelligent, and voluntary."  (*People v. Cunningham* (2015) 61 Cal.4th 609, 633; see *People v. Concepcion* (2008) 45 Cal.4th 77, 82.)  In certain circumstances, defense counsel may waive a defendant's presence but "[a]t a minimum, there must be some evidence that the defendant understood the right he was waiving and the

12

consequences of doing so." (*People v. Davis* (2005) 36 Cal.4th 510, 532 (*Davis*).) The statutory provision which permitted a court to proceed in the defendant's absence at the time of the hearing in this case required a written waiver executed by the defendant in open court. (Former § 977, subd. (b)(1).)

In his briefing and at oral argument, the Attorney General concedes the trial court did not obtain a waiver of Quan's right to be personally present as mandated by former section 977. Respondent nevertheless suggests defense counsel's representation at the outset of the hearing that "I do have authority to appear on his behalf pursuant to 977(b)" suffices to distinguish *Basler*, where the defense attorney incorrectly asserted the defendant's presence was not required. (See *Basler*, *supra*, 80 Cal.App.5th at p. 56.) As respondent phrases it, defense counsel's representation indicated she "had *some* authorization to proceed at the evidentiary hearing without [Quan] being present." *Davis* illustrates the deficiency in this position.

In *Davis*, defense counsel represented he had discussed with his client the details of a pretrial hearing on the admissibility of certain recordings, and that the defendant waived his presence. (*Davis*, supra, 36 Cal.4th at p. 532.) The Supreme Court found the purported waiver to be inadequate: "Here, there is scant evidence of consent, and even less evidence that defendant understood the right he was waiving and the consequences of his waiver. . . . There is no evidence that defense counsel informed defendant of his right to attend the hearing; nor is there evidence that defendant understood that by absenting himself from the hearing he would be unable to contribute to the discussion of the contents of the tape recording." (*Ibid*.)

There was less evidence of any informed consent here, and no evidence Quan ever gave a knowing, voluntary, and intelligent waiver of his right to be present. We infer defense counsel's representation was based largely on the fact she had made prior appearances without Quan. Quan's personal waiver, however, is nowhere to be found in the record. Counsel's ensuing representation of "977(b)" authority at the

13

evidentiary hearing was inadequate since Quan never waived his right to be personally present.

            c.      *Prejudice*

If a petitioner was not present at the hearing, the reviewing court must determine "whether his [or her] absence was harmless beyond a reasonable doubt." (*Basler*, *supra*, 80 Cal.App.5th at p. 59, citing *Chapman v. California* (1967) 386 U.S. 18, 24.) During oral argument, respondent criticized *Basler* as adopting, in effect, a per se standard of reversal whenever the defendant is absent from an evidentiary hearing held under section 1172.6. We disagree. *Basler* recognized the defendant "bears [the] burden of demonstrating his [or her] absence resulted in prejudice or denied his [or her] right to a fair hearing." (*Basler*, at p. 59, citing *People v. Blacksher* (2011) 52 Cal.4th 769, 799.)

After reviewing this entire record, in light of the twin purposes of Quan's right to be present at the hearing—to potentially offer testimony or evidence upon hearing the prosecution's case, and to assist counsel—we cannot say beyond a reasonable doubt that depriving him of that right was harmless. One example suffices: the prosecution's burden on a theory of felony murder to establish Quan's reckless indifference to life. That element has both objective and subjective components. (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) Specifically, "'*knowingly* creating a "grave risk of death"'" is necessary to establish the requisite mindset." (*Guiffreda*, *supra*, 87 Cal.App.5th at p. 125, italics added, quoting *Banks*.) Relevant considerations include, among other factors, "What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, at p. 677.)

Quan was "entitled to hear the People's evidence and argument on the[ese] point[s], then decide whether to testify and/or present additional or new mitigating evidence on his behalf." (*Basler*, *supra*, 80 Cal.App.5th at p. 60.) Had Quan been

14

present, he might have elected to testify about what he knew or didn't know about the men he led to Le's home, what he and Le said to each other during their phone calls and at the scene; and what he saw, heard, said, or did, before and after the murders. "'[A]s a participant in the events in question—[Quan] may well have had something to say.'" (*Basler*, at p. 59.)

Furthermore, "[r]eckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.'" (*Scoggins*, *supra*, 9 Cal.5th at pp. 676-677.) Had he been present, Quan could have addressed what he knew of his confederates' willingness to kill in furtherance of their objectives; when he knew— perhaps preempting the trial court's advance knowledge finding—of the presence of lethal weapons; and when he came to believe his own debt to the men might be forgiven, and whether he understood or expected that as a quid pro quo for his participation in the crime.

We cannot say with confidence that Quan's testimony could never have changed the trial judge's findings. The "'trial court may, or may not, have chosen to believe what [defendant] might have said, if he said anything, but we cannot conclude beyond a reasonable doubt that his presence at the hearing would not have affected the outcome.'" (*Basler*, *supra*, 80 Cal.App.5th at p. 59.)

## DISPOSITION

The order denying defendant's petition is reversed. The matter is remanded with directions to hold a new evidentiary hearing at which Quan "will either be present or provide a knowing, intelligent[,] and voluntary written waiver of his presence." (*Basler*, *supra*, 80 Cal.App.5th at p. 62.) To the extent the prosecutor relies on a theory of felony murder at the hearing, the trial court shall employ in its analysis the guidelines set forth in *Banks*, *supra*, 61 Cal.4th 788, *Clark*, *supra*, 63 Cal.4th 522, and their progeny. To the

15

extent the prosecutor may rely on a theory of implied malice murder based on direct aiding and abetting, the Supreme Court's new decision in *Reyes*, *supra*, 14 Cal.5th 981 supplies the applicable analytical guidelines.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.